UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : Civil Action No. 4:13-cv-2233 |
| ROBERT GANDY, MARCELLOUS McZEAL, and ALVIN AUSBON, | : |
| Defendants. | : |

## COMPLAINT

Plaintiff Securities and Exchange Commission ("Commission") alleges as follows against Defendants Robert Gandy ("Gandy"), Marcellous McZeal, Esq. ("McZeal") and Alvin Ausbon ("Ausbon") (collectively, "Defendants"):

**Summary of Allegations**

1.  In 2011, Gandy and McZeal took control of a public shell company, renamed it PGI Energy, Inc. ("PGI Energy") and engaged in a scheme to sell restricted PGI Energy shares into the public market. To accomplish their scheme, Gandy and McZeal created the false appearance that the restricted shares—which may not be legally sold in public offerings—were unrestricted. They created false promissory notes, signed misleading certifications, and altered PGI Energy's balance sheet to cause the company's transfer agent to issue millions of PGI Energy stock shares without restrictive legends. The stock issued in transactions that converted the false promissory notes into stock. For his role in the scheme, Ausbon signed false promissory notes and diverted stock-sale proceeds back to PGI Energy and Gandy. As a result of this fraud, Gandy, PGI Energy, and Ausbon collectively obtained at least $613,927 in illicit proceeds. McZeal received

at least $19,000 in compensation from PGI Energy that he would not have received had the company not received proceeds from the scheme.

2. By committing the acts alleged in this Complaint, Gandy, McZeal, and Ausbon directly and indirectly engaged in, and unless restrained and enjoined by the Court will continue to engage in, acts, transactions, practices, and courses of business that violate securities-registration provisions and anti-fraud provisions of the federal securities laws, specifically Sections 5(a), 5(c), and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)] and Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

3. The Commission brings this action seeking permanent injunctions, disgorgement plus prejudgment interest, civil penalties, and penny-stock bars as to each Defendant, and officer-and-director bars as to Defendants Gandy and McZeal.

**Jurisdiction and Venue**

4. The Court has jurisdiction of this civil enforcement action pursuant to Section 22(a) of the Securities Act and Sections 21(d), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 77v(a), 78u(d), 78u(e), and 78aa]. The Defendants made use of the means or instruments of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the acts, transactions, practices, and courses of business alleged in this Complaint.

5. Venue lies in the Southern District of Texas pursuant to Section 22(a) of the Securities Act and Section 27 of the Exchange Act [15 U.S.C. §§ 77v(a) and 78aa]. Venue is proper because transactions, acts, practices, courses of business, offers, and sales described herein occurred in, and the Defendants may be found in, the Southern District of Texas.

## STATEMENT OF FACTS

### The Parties

6. Plaintiff Commission, a federal agency charged with enforcing the securities laws of the United States, brings this civil action pursuant to the authority conferred on it by Section 20(b) of the Securities Act and Sections 21(d) and 21(e) of the Exchange Act [15 U.S.C. §§ 77t(b), 78u(d), and 78u(e)].

7. Defendant Gandy, aged 48, is a resident of Richmond, Texas. He owned 35% of PGI Energy's common stock as of January 2011 and served as the company's chief investment officer ("CIO"). He also served as CEO of Pythagoras Group, Inc. ("Pythagoras), a purported "investment banking firm" based in Houston, Texas.

8. Defendant McZeal, aged 43, is a Texas-licensed attorney practicing and residing in Houston, Texas. He served as CEO, corporate treasurer, chief counsel, secretary, and a director of PGI Energy and owned 28% of its common stock as of January 2011.

9. Defendant Ausbon, aged 39, is a resident of Houston, Texas.

### PGI Energy's Precursor: PGI Energy Fund I Series 2010, Inc.

10. In February 2010, Gandy and McZeal founded a company called PGI Energy Fund I Series 2010, Inc. ("PEF") for the purpose of establishing a holding company to acquire energy-industry assets. PEF was a Texas corporation headquartered in Houston, Texas. It had no legal affiliation with the entity that, in 2011, became PGI Energy.

11. In August 2010, Gandy and McZeal filed with the Commission on PEF's behalf a Form S-1 registration statement under the Securities Act, registering an 85 million-share public offering of PEF common stock. They also filed a Form 8-A registration statement on PEF's behalf, registering its common stock under Section 12(g) of the Exchange Act. PEF filed four

post-effective amendments to the Form S-1 registration statement from September through December 2010 in an unsuccessful attempt to address material deficiencies in the registration statement and the subsequent amendments noted by Commission staff.

12. McZeal and Gandy eventually abandoned the PEF stock offering and, in January 2011, caused PEF to deregister its common stock under Section 12(g) of the Exchange Act. They also attempted, unsuccessfully, to withdraw PEF's Form S-1 registration statement.

### PGI Energy Inc.

13. In or around January 2011, Gandy, McZeal, and other members of a buyers group purchased Tensas, Inc. ("Tensas"), a company whose stock was quoted publicly on OTC Link LLC ("OTC Link"). OTC Link is an electronic quotation system that displays stock quotes from broker-dealers for many over-the-counter securities. Gandy and McZeal changed the company's name from Tensas to PGI Energy.

14. PGI Energy was a Delaware corporation headquartered in Houston, Texas. At PGI Energy's inception, McZeal owned 28% of its common stock and served as its chairman and CEO. Gandy owned 35% of its common stock and served as its CIO. Gandy and McZeal controlled the company jointly. While under their control, PGI Energy did not register a securities offering under the Securities Act or a class of securities under the Exchange Act, and it did not file quarterly or annual reports with the Commission.

15. PGI Energy was a shell company. Gandy prepared and McZeal reviewed and signed a PGI Energy Schedule 14C Information Statement ("Information Statement"), which they filed with the Commission on February 10, 2011. The Information Statement stated, "we remain a 'shell company' (as that term is defined in Rule 12b-2 of the Exchange Act) because we had no business operations and because the book value of our collective assets remain nominal."

McZeal signed the Information Statement as PGI Energy's board chairman. Likewise, a Form 8-K/A that McZeal signed and filed with the Commission on February 14, 2011, stated, "[p]revious management . . . was unable to successfully maintain operation of the business, and as a consequence, we . . . had no business operations from 2004-present."

### The Scheme to Cause PGI Energy to Issue Stock without Restrictive Legends

16. In 2011, to raise money for PGI Energy and Gandy and to enable PGI Energy to pay its expenses, Gandy, McZeal, and Ausbon worked together in a scheme to deceive PGI Energy's transfer agent into issuing PGI Energy shares on certificates without restrictive legends. The restrictive legend used by PGI Energy's transfer agent, which was responsible for recording ownership transfers of PGI Energy's stock, stated, among other things, that the shares of stock represented by the certificate had not been registered under the Securities Act and may not be sold or otherwise transferred unless in compliance with the registration provisions of the Securities Act or with an exemption from registration or unless sold pursuant to Rule 144 of the Securities Act. Rule 144 is a safe-harbor provision that allows public resale of "restricted securities" under certain conditions. 17 C.F.R. § 230.144 *et seq*. "Restricted securities" is defined to include securities "acquired directly or indirectly from the issuer, or from an affiliate of the issuer, in a transaction or chain of transactions not involving any public offering." 17 C.F.R. § 230.144(a)(3)(i). Generally, restricted securities issued by a company that is not required to file Commission reports may be publicly resold if, among other things, (1) the reseller holds the restricted securities for one year, and (2) the issuer is not a shell company. 17 C.F.R. § 230.144(d)(1)(ii) and 144(i).

17. In an attempt to satisfy the one-year holding period requirement, some holders of restricted securities utilize so-called wrap around agreements whereby debt securities, generally

in the form of a note convertible to stock that an issuer has purportedly owed to an individual for more than a year, are assigned to a new investor who converts the debt to equity shares of the issuer. Investors use Rule 144(d)(3)(ii) of the Securities Act to calculate the holding period of the newly acquired shares from the date the original debt security was acquired.

### Step One: The Defendants Falsely Backdated Promissory Notes

18. From approximately February 2011 to November 2011, Gandy and McZeal created five promissory notes, backdating them so they appeared to memorialize debt incurred by PGI Energy and PEF more than a year earlier. PGI Energy purportedly issued two notes: (1) a note dated May 7, 2008, to a client of McZeal's law firm (the "Client"), promising to pay the Client $220,000, plus interest due, on August 7, 2009; and (2) a note dated March 15, 2010, to Ausbon, promising to pay him $40,000, plus interest, on or before March 15, 2011. McZeal signed the $220,000 note as PGI Energy's CEO. Gandy signed the $40,000 note as PGI Energy's CIO, and Ausbon signed it as the note holder.

19. PEF purportedly issued three notes: (1) a note dated March 14, 2010, to Ausbon, promising to pay him $10,000, plus interest, on or before March 14, 2011; (2) a note dated April 1, 2010, to Gandy, promising to pay him $50,000 after 180 days with the option to convert any unpaid balance into PEF stock after 180 days; and (3) a note dated April 14, 2010, to Gandy—purportedly in exchange for banking services—promising to pay him $300,000, plus interest, due on July 16, 2011. McZeal signed the $300,000 and $50,000 notes for PEF, and Gandy signed them as note holder. Gandy signed the $10,000 note for PEF, and Ausbon signed it as note holder.

20. As to the notes they signed, Gandy, McZeal, and Ausbon knew or were severely reckless in not knowing that PGI Energy and PEF had not actually incurred the debts reflected in the

notes and that the notes were therefore false. First, the notes were actually drafted and executed in 2011, long after the dates appearing on the notes, the most recent being in April 2010. Second, Gandy and McZeal did not even become PGI Energy officers until January 2011, but they purported to sign notes as PGI Energy officers in 2010. Third, PEF did not even exist in 2008, when it supposedly issued the $220,000 note. Fourth, financial statements in PEF Commission filings, filed by McZeal, reflected no such debt to Ausbon or Gandy as of September 30, 2010, more than five months after PEF supposedly issued their notes. Finally, no such debt was referenced in correspondence between McZeal, Gandy, and PEF's auditors relating to the financial statements.

### Step Two: The Defendants Offered the Bogus Promissory Notes for Sale to Investors

21.     Gandy, McZeal, and Ausbon offered the false promissory notes for sale to investors, signing additional false documents to support the notes' authenticity and to facilitate the notes' conversion into unlegended PGI Energy stock.

### The $300,000 Note

22.      In August 2011, Gandy and McZeal provided the $300,000 note to potential investors, along with five other false documents: (1) An assignment agreement, signed by McZeal, in which PEF purported to assign all of its debts and legal obligations to PGI Energy (the "Assignment Agreement"); (2) PGI Energy's financial statements for the first quarter of 2011, which Gandy had previously directed to be altered to falsely reflect the debt purportedly transferred from PEF; (3) A "Bona Fide Gift Letter" (the "Gift Letter") signed by Gandy, McZeal, and Ausbon in which they certified that Gandy had "gifted" the note to Ausbon on or about June 27, 2011 and that the debt was "valid and outstanding and on the books of the debtor/issuer [PGI Energy]"; (4) A McZeal certification that PGI Energy had owed Ausbon

$300,000 "for more than 12 months" (the "Debt Acknowledgment Certification"); and (5) A McZeal certification that PGI Energy "has had continuing operations from the original date of incorporation to the present and that it is not now and has never been a 'shell company'" (the "Non-Shell Certificate").

23.     In August 2011, an investor forwarded the note to attorney Cameron Linton to obtain a legal opinion for PGI Energy's transfer agent regarding the transferability of stock resulting from the note's conversion. In an email copied to Gandy and McZeal, the investor requested an opinion letter from Linton and also provided Linton the Debt Acknowledgement Certification, Gift Letter, and Non-Shell Certificate. As a result, Gandy and McZeal knew or were severely reckless in not knowing that the investor forwarded the note and the other false documents to Linton for a legal opinion.

24.     Relying on the false note, Debt Acknowledgement Certification, Gift Letter, and Non-Shell Certificate, Linton prepared and sent a letter to PGI Energy's transfer agent, opining that the "debt for conversion to common stock is free trading" and stating that he "relied without investigation on the representations of the parties." Linton's letter, which he contemporaneously sent to Gandy and McZeal, repeated the false claims that PGI Energy issued the note to Gandy in exchange for a $300,000 loan "on April 14, 2010," that PGI Energy "is an operating company and not a shell company as defined under SEC regulations," and that the one-year holding period required under the Securities Act's Rule 144 safe harbor had been met.

25.     Linton subsequently drafted and sent the transfer agent three additional opinion letters, opining that additional shares to be converted from the $300,000 note were "free trading." For each letter, he likewise relied on the false promissory note and the false certifications in the Debt Acknowledgement Certification, Gift Letter, and Non-Shell Certificate.

26. PGI Energy's transfer agent relied on the $300,000 note and on the false information in Linton's opinion letters in converting the note into 522,372,548 unlegended PGI Energy shares in August and September 2011.

27. On August 12, 2011, an investor wired Ausbon $100,000 as partial payment toward the $300,000 note. The same day, Ausbon purchased a $40,000 cashier's check payable to PGI Energy and a $60,000 cashier's check to PGI Energy's landlord. On September 2, 2011, the investor paid Ausbon another $100,000 toward the note. Ausbon retained $5,000 and transferred $95,000 to PGI Energy four days later.

28. In exchange for the $200,000 paid to Ausbon, the investor received 360 million of the unlegended PGI Energy shares converted from the $300,000 note. In August and September 2011, the investor sold the 360 million shares into the market for $413,412.

### The $40,000 Note

29. In September 2011, Gandy presented the $40,000 note to PGI Energy's transfer agent for conversion into stock. Gandy included a Debt Acknowledgment Certification in which McZeal certified "under pain of perjury" that PGI Energy had owed Ausbon $40,000 for more than a year as reflected in the note. Relying on the note and the Debt Acknowledgment Certification, the transfer agent issued 200 million unlegended PGI Energy shares to Ausbon on September 28, 2011.

30. At Gandy's request, Linton drafted and sent the transfer agent an opinion letter dated September 29, 2011, opining that stock converted from the $40,000 note is "free trading." Based on the false representations from Gandy, McZeal, and Ausbon, Linton falsely stated in the letter that PGI Energy had issued the $40,000 note to Ausbon on March 15, 2010, and that full consideration was rendered at that time.

31.   On September 30, 2011, an investor paid Ausbon $60,000 for 200 million PGI Energy shares converted from the $40,000 note. On the same day, Ausbon transferred $50,000 to PGI Energy. In October 2011, the investor sold the 200 million shares into the market for $91,340.

### The $10,000 Note

32.   In November 2011, Linton drafted and sent the transfer agent two opinion letters, opining that the $10,000 note could be converted into unlegended PGI Energy shares. The two letters stated falsely that PGI Energy issued Ausbon the note on March 14, 2010, for a loan and that "[f]ull consideration was rendered at that time." In rendering this opinion, Linton relied on false representations from Gandy, McZeal, and Ausbon: Gandy and Ausbon signed the backdated note, and McZeal certified that PGI Energy was not a shell company.

33.   PGI Energy's transfer agent relied on the $10,000 note to issue 230 million unlegended PGI Energy shares to one investor in October 2011 and relied on the note and Linton's opinion letter in issuing another 135 million shares to another investor in November 2011. In exchange for the stock, the first investor wired Ausbon $57,750 on October 28, 2011. On the same day, Ausbon used the proceeds to purchase three cashier's checks: one for $22,000 to PGI Energy, one for $20,000 to PGI Energy's landlord, and one for $5,000 to Gandy's company, Pythagoras. Three days later, Ausbon deposited $10,000 into PGI Energy's account. The first investor sold all 230 million PGI Energy shares into the market in November 2011 for $65,347.

34.   In November 2011, the second investor paid Ausbon $12,500, which he almost immediately transferred to PGI Energy. Later in the month, the second investor sold all 135 million shares into the market for $24,375.

### The $220,000 Note

35.   In June 2011, Gandy approached an investor about investing in shares to be converted

from the $220,000 note reflecting debt owed to the Client. Gandy and McZeal provided the note to the investor along with a false certification by McZeal that PGI Energy was not a shell. A day later, McZeal sent the investor an affidavit in which McZeal swore to the note's authenticity. The investor provided the note, the false shell certificate, and other documents to Linton, who drafted and sent two opinion letters to the transfer agent. Based on the false note, the false shell certificate, and the other documents, Linton opined in the letters that the Client "was issued a promissory note by [PGI Energy] in the amount of $220,000 on May 7, 2008" and that full consideration for the note "was rendered on or before May 7, 2008."

36. Based on Linton's letters, PGI Energy's transfer agent converted a portion of the purported debt to 104 million unlegended PGI Energy shares in July 2011 and converted an additional portion to 75,862,069 unlegended shares in August 2011.

37. From June to July 2011, the investor paid PGI Energy $235,000 for the $220,000 note. Upon conversion, the investor sold the initial 104 million shares into the market in July 2011 for $198,328 and sold the additional 75,862,069 shares into the market in August 2011 for $180,820.

### The $50,000 Note

38. In or about May 2011, Gandy offered the $50,000 note for sale to an investor. Gandy provided the investor the note and a signed a "Promissory Note Purchase Agreement," in which Gandy falsely represented to the investor that Gandy owned the note "for more than one year." Gandy also provided the investor a letter signed by McZeal, in which McZeal falsely stated that PGI Energy was not and never had been a shell company.

39. The investor provided the $50,000 note, the purchase agreement, and the shell representation to an attorney to procure a written opinion letter for the transfer agent. Based on these documents, the attorney wrote an opinion letter dated June 6, 2011, concluding that the full

consideration for the $50,000 note was rendered on or before April 1, 2010, and that, therefore, the investor was "eligible for free trading common shares, issued free of restrictive endorsement or legend" upon conversion of the note.

40. PGI Energy's transfer agent relied on the attorney opinion letter, the note itself, and authorization from Gandy in converting the bogus debt into 55,665,666 unlegended PGI Energy from June to October 2011. From July to November 2011, the investor wired Gandy $48,677 in five installments, as payment for the converted shares. The investor sold the shares into the market for $105,817 from July to December 2011.

41. Although McZeal did not receive any payments directly from investors in any note-related transaction, he received at least $19,000 in compensation from PGI Energy that he would not have received had the company not received the proceeds from the note sales.

### The Commission Suspended Trading in PGI Energy and Halts the Scheme

42. On February 23, 2012, the Commission suspended trading in PGI Energy because of questions regarding the accuracy and adequacy of representations by PGI Energy in press releases and other public statements concerning the company's business activities and contracts, and the nature and timing of a dividend the company had announced to shareholders. OTC Link never resumed its quotation of PGI Energy shares. As a result, Defendants were not able to continue their scheme. In addition, investors who continued to hold shares purchased as a result of the scheme were unable to sell those shares, other than in private transactions. PGI Energy's bank accounts are now empty and its corporate existence has been declared void by Delaware since March 2013.

### FIRST CLAIM FOR RELIEF
### Violations of Exchange Act Section 10(b) and Exchange Act Rule 10b-5

43. The Commission realleges paragraphs 1 through 42 as if set forth verbatim.

44. Defendants Gandy, McZeal, and Ausbon directly or indirectly, singly or in concert with others, in connection with the purchase and sale of securities, by use of the means and instrumentalities of interstate commerce and by use of the mails, have (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts and have omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, and courses of business which operate as a fraud and deceit upon purchasers, prospective purchasers, and other persons.

45. Defendants Gandy, McZeal, and Ausbon knowingly or severely recklessly engaged in the conduct and made the untrue and misleading statements described in this claim.

46. By reason of the foregoing, Defendants Gandy, McZeal, and Ausbon have violated, and unless enjoined will continue to violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## SECOND CLAIM FOR RELIEF
### Violations of Securities Act Section 17(a)

47. The Commission realleges paragraphs 1 through 42 as if set forth verbatim.

48. By engaging in the engaging in the acts and conduct alleged herein, Defendants Gandy, McZeal, and Ausbon directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, have (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operate or would operate as a fraud or deceit.

49. Defendants Gandy, McZeal, and Ausbon knowingly or severely recklessly engaged in the conduct and made the untrue and misleading statements described in this claim.

50. By reason of the foregoing, Defendants Gandy, McZeal, and Ausbon have violated and, unless enjoined, will continue to violate Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## THIRD CLAIM
### Violations of Securities Act Sections 5(a) and 5(c)

51. The Commission realleges paragraphs 1 through 42 as if set forth verbatim.

52. Defendants, directly or indirectly, singly or in concert with others, have offered to sell, sold, and delivered after sale, certain securities and have (a) made use of the means and instruments of transportation and communication in interstate commerce and of the mails to sell securities, through the use of email, interstate carrier, brokerage transactions, and otherwise; (b) carried and caused to be carried through the mails and in interstate commerce by the means and instruments of transportation such securities for the purpose of sale and for delivery after sale; and (c) made use of the means or instruments of transportation and communication in interstate commerce and of the mails to offer to sell such securities.

53. By reason of the foregoing, Defendants Gandy, McZeal, and Ausbon have violated, and unless enjoined will continue to violate, Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e (c)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a judgment:

### I.

Permanently enjoining Defendants Gandy, McZeal, and Ausbon from future violations of Sections 5(a), 5(c), and 17(a) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §

240.10b-5];

## II.

Ordering Defendants Gandy, McZeal, and Ausbon to disgorge an amount equal to the assets and benefits which they obtained as a result of the violations alleged, plus prejudgment interest on that amount.

## III.

Imposing civil penalties against Defendants Gandy, McZeal, and Ausbon pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)] for violations of the federal securities laws as alleged herein;

## IV.

Permanently barring Defendants Gandy, McZeal, and Ausbon from participating in an offering of penny stock, pursuant to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].

## V.

Permanently barring Defendants Gandy and McZeal from serving as an officer or director of a public reporting company pursuant to Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)] and Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)].

## VI.

Such other and further relief as the Commission may show itself entitled.

Dated:  July 31, 2013

                Respectfully submitted,

                *s/Timothy S. McCole*
                TIMOTHY S. McCOLE
                Mississippi Bar No. 10628
                SDTX Bar No. 899792

                                        Attorney-in-Charge  
                                        United States Securities and  
                                          Exchange Commission  
                                        Fort Worth Regional Office  
                                        801 Cherry Street, Suite 1900  
                                        Fort Worth, Texas 76102  
                                        (817) 978-6453  
                                        (817) 978-4927 (facsimile)  
                                        McColeT@SEC.gov